UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO ORGANIZATION OF RESOURCE COUNCILS; THE ALLIANCE OF IDAHO; A.M.R.; L.M.C.; M.S.; W.G.C.; and J.R.B.M., | Case No. 1:25-cv-00178-AKB **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| RAUL LABRADOR, in his official capacity as Attorney General of the State of Idaho, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs' Emergency Motion for Temporary Restraining Order, Provisional Class Certification, and Preliminary Injunction (Dkt. 3). Plaintiffs, the Idaho Organization of Resource Councils ("IORC"); the Alliance of Idaho ("Alliance"); and A.M.R., L.M.C., M.S., W.G.C., and J.R.B.M. (collectively the "Individual Plaintiffs"[1]) seek injunctive relief against Defendants' enforcement of certain provisions of House Bill No. 83 ("H.B. 83") also known as the Idaho ICE Act (the "ICE Act" or the "Act"), Idaho Code §§ 18-9001 – 9013.[2]

---

[1]    The Individual Plaintiffs are identified in the complaint and other filings only by their initials (*see, e.g.*, Dkt. 1). They have filed a motion to proceed using pseudonyms (Dkt. 5). That motion, however, is not yet ripe.

[2]    When the Idaho Legislature passed the Idaho ICE Act under H.B. 83, it indicated the Act would be codified at Title 18, Chapter 90 of the Idaho Code. The legislature, however, apparently enacted another law (prohibiting the advertisement of illegal drugs), which the legislature also indicated would be codified at Title 18, Chapter 90. Because of this error, the ICE Act is currently cited in legal databases as Idaho Code §§ [18-9101]18-9001 – [18-9113]18-9013, acknowledging that whether the Act is contained in Chapter 90 or 91 is unclear and yet to be determined. For readability purposes, the Court refers to H.B. 83 as being codified under Chapter 90. At some

Plaintiffs' motion is supported by their declarations (Dkts. 3-1 – 3-8). Defendants, who include the Attorney General of the State of Idaho and the elected prosecuting attorneys for every county in Idaho, oppose the motion (Dkt. 36 (opposing motion); Dkt. 47 (amending complaint to include all Idaho's elected prosecuting attorneys as defendants)).

The Court held oral argument on the motion on April 10, 2025 (Dkt. 43). For the reasons discussed below, the Court concludes Plaintiffs have established standing at this stage of the litigation, grants their request for a preliminary injunction, and provisionally certifies two classes of Plaintiffs for this purpose.[3] The Court also appoints Plaintiffs' counsel as class counsel and concludes no bond is required.

## BACKGROUND

The Idaho ICE Act went into effect on March 27, 2025. The Act creates two new state law criminal offenses which Plaintiffs challenge: "illegal entry from foreign nation" ("Illegal Entry") and "illegal reentry by certain aliens" ("Illegal Reentry") (collectively "the challenged offenses"). I.C. §§ 18-9003, 18-9004. The Act's Statement of Purpose provides that the Act "fulfills Idaho's commitment to support the Trump administration in the identification, detainment, and deportation of dangerous illegal aliens found in Idaho." H.B. 83 "Statement of Purpose." The Act applies to

---

point in the future, however, those citations may be incorrect if the Act is eventually codified under Chapter 91.

[3]     Plaintiffs separately filed a Motion for Class Certification which was incorporated into the pending motion (*see* Dkt. 4).The Court expedited briefing (Dkts. 37, 42). At this point, the Court's opinion addresses Plaintiffs' request for provisional class certification only, and considers the arguments made in Defendants' Opposition to Class Certification to be made in opposition to the request for provisional class certification as well. The Court defers a final decision on class certification.

"aliens" as defined by 8 U.S.C. § 1101, which provides an alien is any person who is "not a citizen or national of the United States."[4] I.C. § 18-9002(1); 8 U.S.C. § 1101(a)(3).

Under the Act, an alien commits the offense of Illegal Entry if the alien "enters or attempts to enter this state at any location other than a lawful port of entry or through another manner of lawful entry." I.C. § 18-9003(1). Meanwhile, an alien commits a violation of Illegal Reentry if the alien "enters, attempts to enter, or is at any time found in this state after the person: (a) [h]as been denied admission to or excluded, deported, or removed from the United States; or (b) [h]as departed from the United States while an order of exclusion, deportation, or removal is outstanding." I.C. § 18-9004(1).

The enforcement of both Illegal Entry and Illegal Reentry are limited by an independent crime requirement. Namely, law enforcement may only enforce a violation of either of the challenged offenses "when a person is detained or investigated for suspected commission of an independent crime under title 18, Idaho Code, excluding this chapter, or under chapter 27, title 37, Idaho Code." I.C. §§ 18-9003(3); 18-9004(4). Title 18, referred to in the independent crime requirement, contains eighty-nine different chapters covering a wide range of criminal offenses including, for example, crimes involving violence, theft, public order, and sexual offenses. Chapter 27, Title 37 contains the Uniform Controlled Substances Act and, among other things, prohibits the possession, delivery, and manufacture of controlled substances.

Immediately upon the Act becoming effective on March 27, 2025, Plaintiffs filed a putative class action complaint seeking declaratory and injunctive relief against Defendants and a motion

---

[4]    Because the ICE Act refers to "aliens" and relies on the federal definition of that term, the Court likewise uses the term "alien" in its decision to avoid confusion. Plaintiffs frequently use the term "noncitizen" in their briefing, but that term includes nationals of the United States to which the Ice Act does not apply.

for a temporary restraining order ("TRO"), provisional class certification, and a preliminary injunction to preclude the enforcement of the Act (Dkts. 1-3). The Individual Plaintiffs include five aliens, who allegedly travel between Idaho and other states; the IORC, an organization whose members include alien, seasonal migrant workers who travel between Idaho and other states; and the Alliance, an organization which provides legal services, including to clients who it alleges would be subject to prosecution under the Act. Plaintiffs allege, among other things, that the challenged offenses are unconstitutional because Illegal Reentry violates the Supremacy Clause and the Commerce Clause and because Illegal Entry likewise violates these Clauses as well as the Due Process Clause.

On the same day that Plaintiffs filed their emergency motion for injunctive relief, the Court entered an ex parte TRO enjoining Defendants' enforcement of the Act, ordering Defendants to respond to Plaintiffs' emergency motion on an expedited basis, and scheduling a hearing (Dkts. 15, 16). That hearing occurred on April 10, 2025 (Dkt. 43) During the hearing, Plaintiffs clarified they are only challenging the Illegal Entry and Illegal Reentry provisions of the Act. At the conclusion of the hearing, the Court extended the TRO but modified it to enjoin Defendants' enforcement only as to these challenged offenses (*id.*). For the reasons discussed below, the Court now preliminarily enjoins all Defendants from enforcing the challenged offenses of Illegal Entry and Illegal Reentry.

## ANALYSIS

### A.    Standing

#### 1.  Legal Standard

Defendants challenge the standing of all Plaintiffs—the Individual Plaintiffs, the IORC, and the Alliance (Dkt. 36 at pp. 11-17). Article III of the United States Constitution limits the

federal judiciary to adjudicating only "cases and controversies." U.S. CONST. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The threshold question of standing turns on three elements: "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*.

"[A] recurring issue for federal courts is determining when the threat of enforcement creates a sufficient injury for a party to have standing to bring a pre-enforcement challenge to a law." *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022) (citing three-part test for pre-enforcement standing in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). To establish pre-enforcement standing under *Driehaus*, a plaintiff must show that: (1) he intends "to engage in a course of conduct arguably affected with a constitutional interest"; (2) the challenged statute arguably proscribes the intended future conduct; and (3) "the threat of future enforcement is substantial." *Driehaus*, 573 U.S. at 161-64. While the Court here applies the *Driehaus* standard, it recognizes the Ninth Circuit has "toggled between" *Driehaus* and related tests. *See Nw. Ass'n of Indep. Sch. v. Labrador*, No. 1:24-CV-00335-AKB, 2025 WL 843747, at *6 (D. Idaho Mar. 18, 2025) ("The Ninth Circuit has expressly declined to abrogate [*Thomas v. Anchorage Equal Rts. Comm'n*, 2020 F.3d 1134, 1139 (9th Cir. 2000),] however, while continuing to apply the principles *Driehaus* outlines."). The Court considers those related tests in its analysis here. *See id.*

### 2. Individual Plaintiffs' Standing

Defendants challenge the Individual Plaintiffs' standing under each element of the *Driehaus* test. First, they argue the Individual Plaintiffs lack standing because their course of conduct does not implicate a "constitutional interest" (Dkt. 36 at p. 12). Defendants assert that if

the Individual Plaintiffs' allegations imply any constitutional right, that right is to travel interstate but that Plaintiffs have no such right under the Privileges and Immunities Clauses, U.S. Const. art. IV, § 2; U.S. Const. amend. XIV, § 1, which apply only to U.S. citizens (Dkt. 36 at p. 12) (citing *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (2007)). Individual Plaintiffs dismiss Defendants' assertion that they are relying on a constitutional right to travel and, instead, assert they are vindicating their "constitutional interest" in the Constitution's principles of federalism, namely their right under the Supremacy Clause not to be subject to federally preempted state law offenses (Dkt. 40 at p. 4).

*Driehaus* did not define the scope of its "constitutional interest" requirement. Some district courts in other Circuits have adopted a narrow scope defining a "constitutional interest." They have ruled that to show conduct is "affected with a constitutional interest," a plaintiff must allege a specific constitutional right has been violated or that the plaintiff engaged in constitutionally protected conduct. *Splonskowski v. White*, 714 F. Supp. 3d 1099, 1104 (D.N.D. 2024); *Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1099 (D. Kan. 2015); *see also United States v. Texas*, No. EP-21-CV-173-KC, 2022 WL 868717, at *5 (W.D. Tex. Feb. 17, 2022) ("Plaintiffs have offered no explanation or authority supporting the position that their intended conduct is affected with a constitutional interest related to the Supremacy Clause."), *rev'd and remanded sub nom*, *United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023), *opinion vacated on reconsideration*, No. EP-21-CV-173-KC, 2024 WL 3593683 (W.D. Tex. July 30, 2024). Meanwhile other district courts have adopted a broader scope; namely, a plaintiff alleges a sufficient constitutional interest by invoking a constitutional issue, such as a question of federalism or of separation of powers, even if the issue does not give rise to a cause of action. *See, e.g., Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F. Supp. 3d 509, 521 (N.D. Texas

2024) ("[A] plaintiff need not allege the violation of an articulated right to keep Congress in its lane.").

Here, the Court is cognizant that "the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326 (2015) (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989)). Further, the Court recognizes a "citizen may not sue based only on an asserted right to have the Government act in accordance with law." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). Courts, however, have routinely reviewed plaintiffs' challenges to state prosecutions under the Supremacy Clause. *See, e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 195 (2020) (reviewing appellants' Supremacy Clause challenge against their state prosecution based on preemption by federal immigration laws). In these instances, the plaintiff is injured not because of some aggrieved right under the Supremacy Clause but because the state seeks to prosecute him under a law which violates the Supremacy Clause.

The Ninth Circuit has previously concluded a plaintiff has standing to challenge a state criminal statute as preempted by federal law under the Supremacy Clause. *Valle del Sol v. Whiting*, 732 F.3d 1006, 1012, 1017 (9th Cir. 2013). In *Valle del Sol*, the plaintiff challenged an Arizona statute proscribing the transportation or harboring of an unauthorized alien as preempted by federal law. *Id.* at 1012-13, 1015. The Ninth Circuit concluded the plaintiff "established a credible threat of prosecution under this statute, which she challenge[d] on constitutional grounds." *Id.* at 1015-16. Although the Ninth Circuit did not explicitly identify the constitutional interest at issue, it concluded the plaintiff had standing to challenge the Arizona statute, and its analysis of the merits focused chiefly on federal preemption and the Supremacy Clause. *Id.* at pp. 1017, 1022-29 (explaining "guiding preemption principles"). Since *Valle del Sol*, the Ninth Circuit has again

implicitly recognized a plaintiff's pre-enforcement standing to assert that federal law preempted a state law. *See California Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (2021) (reviewing plaintiffs' preemption challenge to a state law classifying workers as employees rather than independent contractors).

This District has, likewise, found a plaintiff's challenge under the Supremacy Clause to be a sufficient "constitutional interest" under *Driehaus* and rejected the notion that standing for a pre-enforcement challenge is limited to a specific constitutional right. *See St. Luke's Health System, Ltd., v. Labrador*, No. 1:25-CV-00015-BLW, 2025 WL 888840, at *5 (D. Idaho Mar. 20, 2025) (rejecting "the recent suggestion . . . that the statute at issue in a pre-enforcement challenge 'must ostensibly prohibit the exercise of a specific constitutional right'" and concluding that "because [plaintiff's] compliance with [federal law] in these circumstances implicates the Supremacy Clause, that conduct carries a constitutional interest"). Other district courts within the Ninth Circuit have also similarly recognized the Supremacy Clause as a legitimate "constitutional issue." depending upon the context in which plaintiff raises the issue. *See, e.g.*, *Puente Arizona v. Arpaio*, 76 F. Supp. 3d 833, 850 (D. Ariz. 2015) (finding *Driehaus's* "constitutional interest" requirement is "satisfied when a plaintiff challenges a law on constitutional grounds," such as the "Supremacy Clause"), *rev'd in part, vacated in part on other grounds*, 821 F.3d 1098 (9th Cir. 2016).

Here, the Individual Plaintiffs allege their travel in Idaho exposes them to being stopped by law enforcement, investigated, and arrested for Illegal Entry and Illegal Reentry (Dkt. 1 at ¶¶ 86-91; *see* Dkt. 40 at p. 3 n.1) (clarifying Plaintiffs' challenge is limited to Illegal Entry and Illegal Reentry). According to Plaintiffs, this conduct is affected by a "constitutional interest"— mainly, the challenged offenses violate the Supremacy Clause and "principles of federalism" because they conflict with existing federal immigration laws (Dkt. 3-1 at pp. 9-12; Dkt. 40 at p. 4).

Based on these facts, the Court concludes Individual Plaintiffs have adequately alleged a "constitutional interest" in not being prosecuted under an allegedly federally preempted law.

Even if the Court were to construe a "constitutional interest" narrowly to mean only a "constitutional right," the Individual Plaintiffs still satisfy this requirement by alleging that Illegal Entry violates the Due Process Clause because it is void for vagueness. A due process challenge under the "void-for-vagueness" doctrine is a sufficient constitutional interest to establish pre-enforcement standing. *Isaacson v. Mayes*, 84 F.4th 1089, 1098-99 (9th Cir. 2023) ("A void-for-vagueness challenge is rooted in the Due Process Clause. . . . The district court's suggestion that due process challenges, including vagueness challenges, cannot be reviewed before enforcement . . . is also incorrect. . . . Plaintiffs satisfy the first *Driehaus* prong's requirement."). The Due Process Clause applies to all persons within the United States, including aliens who are here unlawfully. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The Individual Plaintiffs allege that they fear prosecution for Illegal Entry and that this provision is unconstitutionally vague because it fails to provide them fair notice of the conduct it proscribes. Accordingly, the Court concludes the Individual Plaintiffs have asserted their conduct is affected by a constitutional interest as it relates to their challenge to Illegal Entry under the Due Process Clause.

Next, Defendants argue the Individual Plaintiffs fail to satisfy the second prong of the *Driehaus* test because they "have not shown an intent to engage in conduct arguably proscribed by the challenged statute" (Dkt. 36 at p. 13). In support, Defendants rely on the Act's independent crime requirement, which limits enforcement of the challenged offenses to instances in which law enforcement detains or investigates an alien suspected of committing another crime. Relying on this requirement, Defendants argue that because the Act's description of "independent crimes" does not include ordinary traffic violations and because the Individual Plaintiffs' allegations focus

on a fear of being stopped for a traffic violation,[5] their alleged conduct is not sufficient to satisfy the second *Driehaus* prong, which requires that the challenged offense arguably proscribes intended future conduct (Dkt. 36 at p. 13).

The Ninth Circuit in *Valle del Sol* addressed a statutory provision similar to the ICE Act's independent crime requirement. In that case, the challenged Arizona statute "only punish[ed] the transportation or harboring of unauthorized aliens where the individual [was] committing some other predicate criminal offense." *Valle del Sol*, 732 F.3d at 1016. Relying on this predicate crime requirement, the state of Arizona argued the plaintiff lacked standing because she had "not alleged an intent to commit any other criminal offense." *Id.* The Ninth Circuit rejected this argument and instead reasoned that "we do not believe that the text of the statute that supposedly imposes this requirement—'in violation of a criminal offense'—has any substantive content that would make prosecution of [the plaintiff] any less likely." *Id.* It explained that the "breadth of the supposed predicate criminal offense provision . . . defeats any claim that the provision narrows the scope of the law sufficiently to deprive [the plaintiff] of standing." *Id.* The Ninth Circuit concluded that because the phrase "in violation of a criminal offense" was broad and unintelligible, prosecution remained likely, and as a result, plaintiffs had sufficiently alleged standing. *Id.* at 1016, 1019.

Here, the Court concludes the ICE Act's independent crime requirement does not preclude the Individual Plaintiffs' standing. As in *Valle del Sol*, the requirement is very broad and does not make prosecution of the Individual Plaintiffs any less likely. Indeed, the Act's independent crime requirement is even more broad than the predicate crime requirement in *Valle del Sol*. Unlike that

---

[5]    The Individual Plaintiffs explain they live in Idaho and routinely travel, including sometimes between Idaho and other states (Dkt. 1 at ¶¶ 25-29, 87-91). Several claim they have been previously stopped by law enforcement, and all fear a future stop by law enforcement would enable an officer to investigate them for "other possible crimes" (*id.*).

case, the Act's independent crime requirement does not require that an alien *must* have committed an independent crime; rather, the requirement is only that law enforcement detain or investigate an alien for a *suspected* crime. Further, although the independent crime requirement does not encompass traffic violations, it does include many other road-related crimes that law enforcement might suspect and investigate while the Individual Plaintiffs are driving on Idaho roads. For example, it includes causing a public nuisance, driving without privileges, or even littering, *See* I.C. §§ 18-3906; 18-5901, 18-8001.[6]

The Individual Plaintiffs do not need to allege they intend to break the law; instead, they only need to allege an intent to engage in conduct—in this case traveling in Idaho—which exposes them to investigation for the identified independent crimes. *See Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024) (ruling plaintiff need not plan to break the law). Accordingly, the Court concludes the Individual Plaintiffs have satisfied the second prong of the *Driehaus* test by adequately alleging the challenged offenses proscribe their intended conduct.

Finally, Defendants argue the Individual Plaintiffs have failed to establish the third prong of the *Driehaus* test because Defendants have not taken any credible action to threaten the enforcement of the challenged offenses. Specifically, Defendants argue Plaintiffs merely "speculate that perhaps [a prosecutor] might someday bring charges against [them]" (Dkt. 36 at p. 14). To establish the third prong of the *Dreihaus* test, a plaintiff must show a threat of enforcement that is "credible," not "imaginary or speculative." *Thomas v. Anchorage Equal Rights*

---

[6]     Another concern with the ICE Act's independent crime requirement is that the Act does not define "investigation." During the hearing, Defendants asserted reasonable suspicion would necessarily be required for an "investigation" under the Act. Based on the current record, the Court does not address the intricacies of this assertion, but it notes reasonable suspicion would not be required for law enforcement to investigate an alien under numerous scenarios permitted under the Act.

*Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000). Generally, "history of past enforcement" is a strong indicator of future enforcement. *Driehaus*, 573 U.S. at 164. This factor, however, has "little weight when the challenged law is relatively new and the record contains little information as to enforcement or interpretation." *California Trucking Ass'n*, 996 F.3d at 653 (internal quotations omitted); *see also Matsumoto v. Labrador*, 122 F.4th 787, 797 (9th Cir. 2024) ("In challenging a new law . . . either a 'general warning of enforcement' or a 'failure to disavow enforcement' is sufficient to establish a credible threat of prosecution . . . ."). The inquiry over whether a defendant poses a credible threat of enforcement "often rises or falls with the enforcing authority's willingness to disavow enforcement." *Peace Ranch*, 93 F.4th at 490 (citing *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-56 (9th Cir. 2000)).

Here, the Court enjoined the ICE Act within hours after it became effective (Dkt. 16). For this reason, the fact that Defendants have not yet attempted to enforce the Act bears little weight, if any, on whether the Individual Plaintiffs have standing. Further, Defendants have had ample opportunity to disavow their intent to enforce the Act but, notably, they have not. *See Peace Ranch*, 93 F.4th at 490 (noting whether plaintiffs show substantial threat of enforcement often rises or falls with enforcing authority's willingness to disavow enforcement). Indeed, Defendants' briefing indicates they intend to enforce the law and would do so but for the Court's TRO (*see, e.g.*, Dkt. 36 at p. 27) ( "The effects of illegal immigration places significant burdens on the state of Idaho . . . . [E]njoining any portion of [the Act] would negatively impact Idaho citizens."). While Defendants have not yet had an opportunity to enforce the Act, the Court concludes Plaintiffs have established a sufficient threat of enforcement at this stage of the litigation.

### 3.  IORC's Standing

Defendants also challenge the IORC's standing. The IORC relies on associational standing, which turns primarily on whether its members have standing. A party has associational standing to sue for its members' injuries when: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The first factor considers whether the association's allegations have established that "at least one identified member had suffered or would suffer harm." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (citation omitted). "The ultimate consideration when determining whether an organization has associational standing is whether it has a 'personal stake in the outcome of the controversy.'" *Am. Unites for Kids*, 985 F.3d at 1097 (quoting *Oregon Advocacy v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2021)).

Here, the IORC claims that its mission is to advocate on behalf of immigrant communities and that its programs focus "primarily on monitoring active and potential legislation that affects its members and communities; advocating for legislative changes" (Dkt. 1 at ¶¶ 11-12). Defendants do not dispute that IORC brings this lawsuit to protect interests germane to its mission. Instead, Defendants argue IORC "has not identified a single member with standing" (Dkt. 36 at p. 15). To the contrary, however, the IORC alleges its membership includes the Individual Plaintiffs (Dkt. 1 at ¶ 16; Dkt. 3-2 at ¶¶ 15-17). Likewise, the Individual Plaintiffs attest they are IORC members (Dkt. 3-4 at ¶ 3; Dkt. 3-5 at ¶ 3; Dkt. 3-6 at ¶ 3; Dkt. 3-7 at ¶ 3; Dkt. 3-8 at ¶ 3). As explained above, the Court concludes these Individual Plaintiffs have standing. Accordingly, the Court finds

the IORC has a sufficient "personal stake" in the litigation's outcome and concludes it has established associational standing.

### 4. The Alliance's Standing

Defendants also argue the Alliance lacks third-party standing (Dkt. 36 at pp. 16-17). In reply, the Alliance clarifies it does not seek to assert the rights of third parties; rather the Alliance contends it has organizational standing (Dkt. 40 at pp. 8-9). An organization may have standing "to sue on [its] own behalf for injuries [it has] sustained." *All. for Hippocratic Med.*, 602 U.S. at 393 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). The organization "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Id.* at 369.

The Ninth Circuit has previously found "organizational standing" when a defendant's behavior has "frustrated [the organization's] mission and caused it to divert resources in response to that frustration of purpose." *Nielsen v. Thornell*, 101 F.4th 1164, 1169-71 (9th Cir. 2024) (explaining "diversion-of-resources" theory of organizational standing), *as amended* (July 8, 2024); *contra Arizona All. for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024) (overruling *Nielsen's* diversion-of-resources theory), *reh'g en banc granted, opinion vacated*, 130 F.4th 1177 (9th Cir. 2025). This Court has previously acknowledged the nuances of the "diversion-of-resources" theory for organizational standing. *See March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1138 (D. Idaho 2024) (citing *Alliance for Hippocratic Medicine*, 602 U.S. at 393-95 and noting there is no "categorical rule allowing standing whenever an organization diverts its resources in response to a defendant's actions") (internal quotations omitted). Generally, an "organization's mere desire to act (and in the process spend resources) to oppose a policy cannot confer standing to challenge [a] policy." *Nielsen*, 101 F.4th at 1170 n.2. Rather, the plaintiff must

show a defendant's actions affected and interfered with its "core business activities." *Alliance for Hippocratic Med.*, 602 U.S. at 395.

The Alliance states its mission is to "provide[] low-cost immigration legal services" to families in Blaine County, Idaho, and the surrounding communities (Dkt. 1 at ¶¶ 18-19). The Alliance contends the Act would hinder its "ability to fulfill its core mission" by making it more costly to reach clients detained under the Act; require it to hire additional attorneys familiar with state criminal laws; and require it to overhaul existing programs (*id.* at ¶ 22, Dkt. 40 at p. 6). In other words, the Alliance contends the Act makes the Alliance's "effective representation impossible" because it "subjects [its] clients to arrest and detention far from the Alliance's offices" (Dkt. 40 at p. 8). If the Alliance's anticipated expenses due to the Act fall under "business activities," these allegations may be enough to establish organizational standing. *See, e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021) (finding organizations had standing because they diverted resources to help refugee clients counteract new asylum rules). If, however, the expenses are merely "advocacy" expenses incurred to oppose the Act, then the allegations are insufficient to confer organizational standing. *See, e.g.*, *Free Speech Coalition v. Knudsen*, 754 F. Supp. 3d 1037, 1056 (D. Montana 2024) (finding interest group lacked organizational standing because there was "no sense in which [the challenged statute] can be said to directly injure the organization['s] pre-existing core activities, apart from the plaintiffs' response to that [statutory] provision") (internal citations omitted).

Whether the Alliance has standing based on the current record is questionable. The Court need not resolve that question at this time, however. In a suit with multiple plaintiffs, generally only one plaintiff needs to have standing for the suit to proceed at the preliminary injunction phase. *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022). Plaintiffs have satisfied this requirement

because they only seek injunctive relief and both the Individual Plaintiffs and the IORC have established standing. Because the Alliance raises no independent claims, its standing does not preclude the Court from reaching the merits of Plaintiffs' preliminary injunction motion.

### 5. The Unclean Hands Doctrine

Finally, Defendants argue the equitable doctrine of "unclean hands" bars Plaintiffs (mainly the Individual Plaintiffs) from asserting their claims (Dkt. 36 at p. 17). The unclean hands doctrine provides that "a plaintiff asking a court for equitable relief 'must come with clean hands.'" *Northbay Wellness Group, Inc. v. Beyries*, 789 F.3d 956, 959 (9th Cir. 2015) (citing *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944)). It "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989). The doctrine is not a "quality of suitors" test. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). A court applies the doctrine only for violations that "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Id.*; *see also Lucent Technologies, Inc. v. Gateway, Inc.*, No. CIV. 02-2060-B(CAB), 2007 WL 2900484, at *9-10 (S. D. Cal. 2007) (rejecting unclean hands defense because plaintiff's conduct had not "affected the equities between the parties in the instant litigation"). The doctrine gives the Court a "wide range" of discretion in evaluating the plaintiff's alleged misconduct. *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945).

In support of Defendants' argument that the unclean hands doctrine bars Plaintiffs' claims here, Defendants rely on *Nat'l Coal. of Latino Clergy, Inc. v. Henry*, No. 07-CV-613-JHP, 2007 WL 4390650, at *1 (N.D. Okla. Dec. 12, 2007) ("*Henry*"), for the proposition that the doctrine

precludes illegal alien plaintiffs from obtaining pre-enforcement relief from a state immigration law (Dkt. 36 at pp. 9-10). In this unpublished opinion, the district court created "a new, and narrow, prudential limitation on standing," where any "illegal alien, in willful violation of federal immigration law, is without standing to challenge the constitutionality of a state law, when compliance with federal law would absolve the illegal alien's constitutional dilemma." *Henry*, 2007 WL 4390650, at *9. Defendants provide no example of any other court endorsing this new prudential rule, and the Court is not aware of any.[7] Contrary to *Henry*, the Ninth Circuit has concluded a plaintiff had standing to challenge a state immigration law as preempted, even though the plaintiff had previously violated federal immigration law. *See, e.g.*, *Valle del Sol*, 732 F.3d at 1017 (finding plaintiffs had standing to challenge a state immigration law).

Here, the Individual Plaintiffs' alleged misconduct is entering or reentering the United States in violation of federal immigration laws. Plaintiffs are not challenging the Individual Plaintiffs' legal status under federal law, however, or seeking to enjoin the federal government from enforcing federal law. Rather, Plaintiffs are challenging the state's authority to enforce the challenged offenses, which they contend federal law preempts. Although the Court does not condone Plaintiffs' violation of federal immigration law, their misconduct does not relate to the equitable relationship between Plaintiffs and Defendants in this case. *See Keystone Driller Co.*, 290 U.S. at 245. As a result, Defendants cannot assert a valid unclean hands defense.

---

[7]    The Third Circuit has expressly declined to adopt this new prudential rule. *Lozano v. City of Hazleton*, 620 F.3d 170, 194 (3d Cir. 2010) (declining to adopt *Henry*'s prudential rule because, among other reasons, Supreme Court has certainly "considered judicial challenges brought by persons lacking lawful immigration status, *see, e.g.*, [*Plyler v. Doe*, 457 U.S. 202 (1982)], even when 'compliance with federal law' would have absolved 'the illegal alien's constitutional dilemma'"), *granting certiorari and vacating judgment*, 563 U.S. 1030 (remanding for further consideration in light of *Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582 (2011)), *affirmed on remand*, 724 F.3d 297, *cert denied*, 571 U.S. 1237.

Moreover, even if Plaintiffs' violations of federal immigration law were more closely related to the parties' equitable relationship, other factors weigh against barring Plaintiffs' relief under the unclean hands doctrine. The doctrine is a "self-imposed ordinance" rooted in the court's equitable powers. *Precision Instrument Mfg. Co*., 324 U.S. at 814. The doctrine is not a jurisdictional bar. *See id.* Given its equitable characteristics, the doctrine "should not be strictly enforced when to do so would frustrate a substantial public interest." *E.E.O.C. v. Recruit USA, Inc.*, 939 F.2d 746, 753 (1991). Both parties raise important questions of public interest—mainly, the scope of Idaho's authority to legislate on immigration. The public has an interest in resolving these questions. Accordingly, the Court finds that the doctrine of unclean hands does not bar the Individual Plaintiffs from bringing the instant claims. To the degree that Defendants argue Plaintiffs' unclean hands undermine the IORC's and Alliance's standing or claims, the Court rejects these arguments as unpersuasive for the same reasons.

**B**.    **Preliminary Injunction**

**1.    Legal Standard**

Having concluded that at least the Individual Plaintiffs and the IORC have standing at this stage of the litigation, the Court addresses Plaintiffs' motion for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure to enjoin Defendants from enforcing Illegal Entry and Illegal Reentry. Under Rule 65, a party may obtain injunctive relief before a final judgment in certain limited circumstances. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). "Ordinarily, [preliminary] injunctions . . . may go no further than necessary to provide interim relief to the parties," and any equitable remedy must not be "more burdensome to the defendant than necessary

to [redress] the plaintiff's injuries." *Labrador v. Poe by & through Poe*, —— U.S. ——, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; he is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in his favor; and an injunction is in the public interest. *Winter*, 555 U.S. at 20. The movant must carry this burden "by a clear showing." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter*, 555 U.S. at 24. When the government is a party, the factors regarding public interest and equities merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). Courts in the Ninth Circuit apply a "sliding scale" standard, "allowing a stronger showing of one element to offset a weaker showing of another." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (citing *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). Under this approach, an injunction is proper where "serious questions going to the merits" and a hardship balance "tips sharply toward the plaintiff." *Alliance for the Wild Rockies*, 632 F.3d at 1132; *see also N.D. v. Reykdal*, 102 F.4th 982, 992 (9th Cir. 2024) (noting the merits factor is "the most important" in court's analysis).

### 2. Likelihood of Success on the Merits

#### a. Supremacy Clause

Plaintiffs argue Illegal Entry and Illegal Reentry violate the Supremacy Clause and are preempted by federal law. Specifically, they argue "entry and continued presence [in the United States] are quintessentially federal fields that Idaho may not regulate because they are central to the federal government's exclusive immigration authority and Congress's comprehensive

immigration scheme" (Dkt. 3-1 at p. 6). Plaintiffs assert the challenged offenses are both field and conflict preempted.

The Supremacy Clause provides a clear rule that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Law of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under this principle, Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "[T]he source of preemption in the immigration context is unique." *Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957, 972 (9th Cir. 2017). The federal government derives its authority to regulate aliens' status from various sources including its power to a establish a uniform rule of naturalization, its power to regulate foreign commerce, and its broad authority over foreign affairs. *Id.* As the Ninth Circuit has noted, "Supreme Court precedent explains that 'neither a clear encroachment on exclusive federal powers nor a clear conflict with a specific congressional purpose is required' for federal law to preempt a state's regulation of immigrants." *Id.*

Plaintiffs raise two preemption arguments here: conflict preemption and field preemption.[8] Under field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. Field preemption occurs when a federal interest is "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" or when

---

[8]    Preemption categories "are not rigidly distinct." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (1988)). Here, the litigants invoke overlapping principles of conflict and field preemption. To some degree, Plaintiffs' case for conflict preemption "merges" with field preemption. *See Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050-51 (7th Cir. 2013) ("When Congress occupies an entire field, one might also say that Congress has set forth a purpose and objective of controlling an entire field of regulation. In this way the purposes and objectives subcategory of conflict preemption merges with field preemption."). Accordingly, the Court addresses litigants' arguments collectively without undue emphasis on field versus conflict preemption.

"a framework of regulation is so pervasive that Congress left no room for the States to supplement it." *Id.* "Where Congress occupies an entire field . . . even complementary state regulation is impermissible." *Id.* at 401. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.*

Under conflict preemption, state laws are preempted "when they conflict with federal law." *Id.* at 399. A preemptive conflict occurs when "compliance with both federal and state regulations is a physical impossibility" or when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Id.* (internal quotations omitted). The "conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress," *Garcia*, 589 U.S. at 202, not from a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives." *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011).

While opposing Plaintiffs' assertion that federal law preempts Illegal Entry and Illegal Reentry, Defendants state they are "[m]indful of federal immigration law and case law."[9] (Dkt. 36 at p. 10). Those authorities provide that the federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. "Federal governance of immigration and alien status is extensive and complex." *Id.* at 395. "To implement its immigration policy, the [federal government] must be able to decide (1) who may enter the country and (2) who may stay here after entering." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). The Supreme Court has noted the Constitution reserves exclusive power over entry into the country to the federal government. *Plyler*, 457 U.S. at 228 n.23 ("[T]he State has no direct interest in

---

[9]    Likewise, Defendants state they are "[m]indful of federal immigration law and related case law," in their motion to dismiss Plaintiffs' lawsuit (Dkt. 44-1). That motion is not yet ripe.

controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government.").

Exercising this exclusive power, Congress has enacted the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1104 – 1401, which governs, among other things, who may enter the United States, where and how they may enter, and what may occur if they enter unlawfully. A "central concern" of the INA is "with the terms and conditions of admission to the country." *DeCanas v. Bica*, 424 U.S. 351, 359 (1976). For example, the INA requires that entry into the United States must occur through designated entry points, where aliens must present entry documents, and undergo inspection. 8 U.S.C. § 1225(a)(3). The INA makes it unlawful for an alien to enter the United States other than through a port of entry or to reenter the United States after removal. Specifically, § 1325(a) makes it unlawful for an alien to enter or attempt to enter the United States "at any time or place other than designated by immigration officers," and § 1326(a) makes it unlawful for an alien who has been "denied admission, excluded, deported, or removed from the United States" to enter, attempt to enter, or be found at any time in the United States.

Here, Defendants concede that the challenged offenses of Illegal Entry and Illegal Reentry are "like federal law" (Dkt. 36 at p. 20). As they acknowledge, just like § 1325(a), Illegal Entry "makes it a crime for an alien to enter into the country at any location other than a port of entry," and just like § 1326(a), Illegal Reentry "prohibits an alien from reentering the state after being 'denied admission to or excluded, deported, or removed from the United States'" or having otherwise departed under such an order (Dkt. 36 at p. 20). Based on these acknowledgements, Defendants reason that the challenged offenses are not preempted because they do "nothing more than bolster existing federal law and complement[] federal objectives" (*id.* at p. 21).

A state regulation which "has the same aim as federal law," however, is precisely the type of state regulation the doctrine of preemption is intended to preclude. *Arizona*, 567 U.S. at 402 (rejecting argument that state law having "same aim as federal law" is not preempted). In essence, Illegal Entry and Illegal Reentry imposes additional state law penalties for conduct Congress has already proscribed under §§ 1325 and 1326. As the Supreme Court in *Arizona* ruled, "[p]ermitting the State to impose its own penalties for the federal offenses . . . would conflict with the careful framework Congress adopted." 567 U.S. at 402. Such is the case here—the Idaho Legislature's attempt to "bolster" federal law by imposing state law remedies conflicts with and is preempted by the federal law.

Defendants attempt to avoid the Supreme Court's explanation of federal preemption in *Arizona* by arguing that *Arizona* only narrowly applies to "alien registration" and that the ICE Act does not regulate alien registration (Dkt. 36 at p. 19). This Court does not read *Arizona* so narrowly but rather finds the Supreme Court's discussion and analysis in *Arizona* very instructive for determining whether the federal government has the exclusive power to regulate aliens' entry and reentry. At least three courts addressing other states' attempts, like Idaho's, to regulate aliens' entry and reentry have likewise concluded *Arizona* is instructive in this context. *See United States v. Iowa*, 126 F.4th 1334, 1346 (8th Cir. 2025) (citing *Arizona*) (holding state-by-state immigration policy is "precisely the result the Supreme Court in *Arizona* found barred by conflict preemption"); *United States v. Texas*, 97 F.4th 268, 279 (5th Cir. 2024) ("The Supreme Court's decision in *Arizona v. United States* provides considerable guidance as to whether Texas is likely to succeed on the merits of the preemption issue."); *United States v. Oklahoma*, 739 F. Supp. 3d 985, 998-99 (W.D. Okla. 2024) (citing cases and concluding "this Court sees no reason why *Arizona*'s logic does not naturally extend to this case [addressing state laws] regulating noncitizen entry and

reentry").[10] Even without these cases, however, the Court finds Defendants' attempt to limit *Arizona* exclusively to the field of alien registration unpersuasive.

Also, Defendants' assertion that Illegal Entry and Illegal Reentry are not federally preempted because they "mirror federal objectives and incorporate federal immigration classifications" is unpersuasive (Dkt. 36 at p. 20). The Ninth Circuit in *Arizona Dream* explained that "States can regulate areas of traditional state concern that might impact noncitizens [if those regulations] mirror federal objectives and incorporate federal immigration classifications." 855 F.3d at 972. This principle, however, does not apply where a state, as in this case, attempts to regulate conduct like immigration, which is not a traditional state power. Rather, as the Supreme Court in *Arizona* stated, an argument that a state regulation is not preempted because it "has the same aim as federal law and adopts its substantive standards" ignores the "basic premise" of preemption. 567 U.S. at 402.

Finally, the ICE Act very likely presents a serious obstacle to accomplishing and executing Congress' objective in granting broad discretion to federal officials in matters of immigration. *See Bourfa v. Mayorkas*, 604 U.S. 6, 9 (2024) ("A common feature of our Nation's complex system of lawful immigration is mandatory statutory rules paired with discretionary exceptions."); *Arizona*, 567 U.S. at 399-400 (ruling conflict preemption occurs when "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress") (internal quotations omitted). This broad federal discretion includes making decisions

---

[10]    The courts in these cases—arising in Iowa, Texas, and Oklahoma—each concluded federal law preempted state laws regulating aliens' entry and reentry. Defendants suggest these cases should not be cited because the United States, who was the plaintiff in each case, voluntarily dismissed the cases "showing that the U.S. government has changed its position on these laws" (Dkt. 36 at p. 10). The Department of Justice's change in position in those cases, however, does not undermine the courts' discussions of the rule of law articulated in *Arizona*, by which this Court is bound.

about which aliens to arrest and prosecute. As the Supreme Court has noted, "the Executive Branch must balance many factors when devising arrest and prosecution policies." *United States v. Texas*, 599 U.S. 670, 680 (2023). As a result, federal officials may prioritize the arrest of aliens who have committed serious crimes in lieu of enforcing federal laws against otherwise law abiding aliens who, for example, have United States born children or distinguished military service. *Arizona*, 567 U.S. at 396. In conflict with these policies, state officials' enforcement of the ICE Act allows aliens to be investigated, arrested, and confined without regard to federal discretionary policies. Moreover, these federal discretionary policies may quickly evolve, making it impossible for state law enforcement to mimic them and, thereby, creating an obstacle to accomplishing them. *See Arizona*, 567 U.S. at 396 (noting federal discretion is designed to "embrace[] immediate human concerns").

For the foregoing reasons, the Court concludes that Plaintiffs have shown they are substantially likely to succeed on the merits of their claim that federal law preempts the challenged offenses of Illegal Entry and Illegal Reentry and that factor weighs in favor of granting injunctive relief. Having reached this conclusion, it is unclear whether the Court must address Plaintiffs' remaining constitutional challenges under the Commerce Clause and Due Process Clause. Ninth Circuit decisions appear to approach the issue somewhat differently, in one case concluding that the Court only needed to address preemption but then in another case deciding to address both preemption and a due process vagueness challenge. *Compare Arizona Dream*, 855 F.3d at 966, 970-71 (addressing challenge under Equal Protection Clause but noting federal courts do not decide federal constitutional question where dispositive nonconstitutional ground, such as under Supremacy Clause, is available) *with Valle De Sol*, 732 F.3d 1006 (addressing preemption argument under Supremacy Clause after first addressing vagueness argument). Here, the Court

addresses Plaintiffs' claim that the Illegal Entry provision is unconstitutionally vague in violation of the Due Process Clause but reserves the issue of whether the challenged offenses violate the Commerce Clause because the parties' arguments on that issue are not yet well-developed (*see* Dkt. 3-1 at pp. 15-16; Dkt. 36 at pp. 23-24).

### b. Due Process Clause

Plaintiffs challenge the offense of Illegal Entry under the Due Process Clause. A "basic principle of due process [is] that an enactment is void for vagueness if its prohibitions are not clearly defined." *Valle del Sol*, 732 F.3d at 1019. A statute is not clearly defined if it fails to provide ordinary people fair notice of the conduct it proscribes or is so standardless it encourages arbitrary and discriminatory law enforcement. *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018). "Where a statute imposes criminal sanctions, a more demanding standard of scrutiny applies." *Valle del Sol*, 732 F.3d at 1019 (quotations omitted).

Here, Defendants have conceded that Illegal Entry is "like federal law" and is intended to mirror § 1325(a) (Dkt. 36 at pp. 20-21). The language of the two provisions, however, is somewhat different. *Compare* I.C. § 18-9003(1) *with* 8 U.S.C. § 1325(a). For example, § 1325 prohibits an alien from "enter[ing] or attempt[ing] to enter the United States at any time or any place other than as designated by immigration officers." 8 U.S.C. § 1325(a). Meanwhile, the Act's Illegal Entry provision prohibits an alien from "enter[ing] or attempt[ing] to enter *this state* at any location other than a lawful port of entry or *through another manner of entry*." I.C. § 18-9003(1) (emphasis added). Plaintiffs' due process challenge focuses on this latter italicized language—"through another manner of entry"—and asserts this phrase has "no discernable meaning," fails to provide notice of the conduct it prohibits, and invites arbitrary and discriminatory enforcement (Dkt. 3-1 at pp. 16-17).

In response, Defendants assert the phrase "through another manner of entry" means "any lawful entry allowed by the U.S. government" (Dkt. 36 at pp. 24-25). In support, they cite the Code of Federal Regulations, specifically subsections (a) and (g)(1) of 8 C.F.R. § 235.1 (Dkt. 36 at pp. 24-25). These subsections provide that lawful entry into the United States shall be made "at a U.S. port-of-entry" and that a Canadian citizen or permanent resident may "enter the [United States] by means of a pleasure craft along the northern border" if in possession of a Canadian Border Boat Landing Permit. 8 C.F.R. § 235.1(a), (g)(1). On reply, Plaintiffs note that Defendant's explanation conflicts with the language in § 18-9003(1) referring to entry into "this state."

Under the plain language of § 18-9003(1) determining the proscribed conduct is difficult. This provision—which is entitled "Illegal Entry From *Foreign Nation*"—proscribes an alien from entering "*this state*" "other than through a lawful port of entry" or "another manner of lawful entry." I.C. § 18-9003(1) (emphasis added). To comply with this law, aliens must be able to identify lawful "ports of entry" or "another manner of lawful entry" into "this state." The ICE Act defines a "port of entry" pursuant to 19 C.F.R. § 101. I.C. § 18-9002(9). In turn, 19 C.F.R. § 101.3 (Idaho) identifies three ports of entry into Idaho: one in Boise and two at the Canadian border at Porthill and Eastport. Although the Act does not define "another manner of lawful entry," Defendants explain this phrase means entry under 8 C.F.R. § 235.1(g)(1) via a boat from Canada.

In other words, based on Defendants' explanation and the plain language of § 18-9003(1), Illegal Entry provides an alien—meaning a person who is not a citizen or national of the United States—may *only* enter Idaho through the lawful ports of entry at Boise, Porthill, or Eastport, or on a boat from Canada. In other words, an alien—even one who is legally in the United States—commits Illegal Entry (absent proving an affirmative defense) by entering Idaho via a federal highway such as Interstate 84, 15, and 90, among other avenues. To avoid this absurd result,

Defendants characterize Illegal Entry as "mak[ing] it a crime for an alien to enter *into the country* at any location other than a port of entry" (Dkt. 36 at p. 20) (emphasis added).

That characterization, however, does not comport with the statute's plain language which expressly refers to entry into "this state." I.C. § 18-9003(1). If the Idaho Legislature had intended to proscribe entry into the country, it could have limited Illegal Entry to entry into the United States versus into Idaho. Further, Defendants' interpretation of the offense—which is inconsistent with the statute's language—highlights that the offense is likely subject to arbitrary and discriminatory enforcement and fails to provide ordinary people fair notice of the conduct it proscribes. *See Dimaya*, 584 U.S. at 156. For these reasons, the Court finds that Plaintiffs have shown they are reasonably likely to prevail in establishing that Illegal Entry violates the Due Process Clause and is void for vagueness and that this factor weighs in favor of granting Plaintiffs injunctive relief.

### 3. Irreparable Harm

Regarding irreparable harm, Plaintiffs argue "the Individual Plaintiffs and IORC's members will suffer irreparable harm by being placed at risk of arrest, prosecution, and detention" for the preempted, challenged offenses (Dkt. 3-1 at p. 18). Defendants argue this alleged harm is inadequate to establish irreparable harm, and they reassert their arguments that Plaintiffs lack standing. Namely, Defendants argue that Plaintiffs' harm is speculative because of the independent crime requirement, which limits the enforcement of the challenged offenses to instances when an alien is detained or investigated for the suspected commission of another crime. Defendants argue the Court must assume that Plaintiffs will follow the law and, thus, will not be investigated, detained, or arrested for the challenged offenses (Dkt. 36 at p. 27).

For all the same reasons the Court rejected Defendants' argument that Plaintiffs' lack standing, it rejects Defendants' argument that Plaintiffs' alleged irreparable harm is speculative.

As noted above, the independent crime requirement is broad, and for that reason, it does not make speculative Plaintiffs' allegations that they are at risk of investigation. Further, Plaintiffs are likely to succeed on the merits of their claim that the challenged offenses violate their constitutional interests because federal law preempts them. Such "[a]n alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's Bookstore, Inc. v. Superior Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984). Because Plaintiffs are at risk of being subject to criminal penalties allegedly preempted by federal law, the Court finds that they are likely to suffer irreparable injury and that this factor weighs in favor of granting injunctive relief. *Cf. Georgia Latino All. for Hum. Rts. v. Deal*, 793 F. Supp. 2d 1317, 1340 (N.D. Ga. 2011) (concluding plaintiffs subject to criminal penalties under preempted state law likely to suffer irreparable injury), *aff'd in part*, *rev'd on other grounds and remanded sub nom. Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012).

### 4.  Public Interest and Balance of Hardships

When the government opposes a preliminary injunction, "the third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). The balance of equities inquiry concerns the plaintiffs' burdens or hardships compared to the defendants' burden if the court orders the injunction. *Id.* Meanwhile, the public interest mostly concerns the injunction's impact on nonparties. *Id.*

Defendants argue that the effects of illegal immigration place significant burdens on Idaho; Idaho citizens feel those burdens; and the ICE Act reduces those burdens "in a way that complements federal law" (Dkt. 36 at p. 27). While the Court recognizes a strong public interest in regulating immigration, the enforcement of state regulations, which impose a different means

of enforcement and penalty for conduct which federal law already proscribes, does not effectively foster that interest. Further, it conflicts with the public's strong interest in the rule of law being applied uniformly and consistently, especially in matters implicating nationwide concerns such as illegal immigration.

The burden on Defendants if they are preliminarily enjoined from enforcing the challenged offenses is a continuation of the status quo. Defendants have never previously regulated aliens' entry or reentry into either Idaho or the United States, and Defendants fail to explain why being unable to do so during the pendency of a preliminary injunction presents a significant burden. In contrast, the Individual Plaintiffs and the IORC's members face potentially improper arrest and confinement under a state law that is federally preempted because, among other things, it imposes penalties inconsistent with federal law. On balance, the Court finds that the public interest and hardships tip strongly in Plaintiffs' favor, particularly because there are serious questions going to the merits of Plaintiffs' claims. Accordingly, the Court grants Plaintiffs' motion for preliminary injunction and enjoins all Defendants from enforcing either Illegal Entry or Illegal Reentry.

**B.     Bond Requirement**

Plaintiffs argue the Court should waive the bond requirement under Rule 65(c) of the Federal Rules of Civil Procedure "[b]ecause there is no risk of monetary harm to Defendants if they are eventually found to be wrongfully enjoined" (Dkt. 3-1 at p. 22). Defendants do not oppose Plaintiffs' request to waive the bond, and they provide no evidence regarding any costs they may incur because the Court is enjoining their enforcement of Illegal Entry and Illegal Reentry. Accordingly, the Court finds that no bond is necessary and waives the requirement. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented*, 236 F.3d 1115 (9th Cir. 2001)

("Absent any showing by defendants of cost, we cannot say the district court clearly abused its discretion in determining the bond amount.").

## C.    Provisional Class Certification

### 1.    Legal Standard

Having concluded Plaintiffs satisfy the requirements under Rule 65 for a preliminary injunction, the Court must determine the scope of the injunction. For this purpose, Plaintiffs request the Court to provisionally certify two classes of Plaintiffs under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. Those classes are "The Entry Class," which would include all individuals potentially subject to the Illegal Entry provision, and "The Reentry Class," which would include all individuals potentially subject to the Illegal Reentry provision (Dkt. 4-1 at p. 2). A trial court has broad discretion regarding whether to grant a motion for class certification. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). Courts routinely grant provisional class certification for purposes of entering injunctive relief. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012) (affirming provisional class certification for purposes of a preliminary injunction); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 (9th Cir. 2020) (same).

Rule 23(a) requires the parties seeking class certification to affirmatively demonstrate the proposed class meets four threshold requirements: (1) numerosity—the class is so large that joinder of all members is impracticable; (2) commonality—one or more questions of law or fact is common to the class; (3) typicality—the named parties' claims are typical of the class; and (4) adequate representation—the class representatives will fairly and adequately protect the interests of other class members. Fed. R. Civ. P. 23(a); *Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996, 1002 (9th 2018). A district court must conduct a "rigorous analysis" that frequently "will

entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). This "rigorous" evaluation, however, is not a mini-trial. *Sali*, 909 F.3d at 1004. "A district court need only consider material sufficient to form a reasonable judgment on each [Rule 23] requirement," and "[t]he court's consideration is not limited to only admissible evidence." *Id.* 1005.

If Rule 23(a) is satisfied, then a class action may be maintained under Rule 23(b)(2) if the party opposing certification "has acted . . . on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) has been utilized most frequently in class actions seeking injunctive relief. WRIGHT & MILLER, 7AA FED. PRAC. & PROC. CIV. § 1775 (3d ed.) It is described as "uniquely appropriate procedure in civil-rights cases, which generally involve an allegation of discrimination against a group as well as the violation of rights of particular individuals." *Id.* at § 1776. The requirements of Rule 23(b)(2) "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (citation omitted). Here, Defendants do not dispute Plaintiffs have met the requirements of Rule 23(b); rather, Defendants argue Plaintiffs have failed to meet Rule 23(a)'s requirements.[11]

## 2. Numerosity

Numerosity requires a showing that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, for purposes of estimating the number of class

---

[11]    In opposition to Plaintiffs' motion to certify a class, Defendants also argue the unclean hands doctrine bars Plaintiffs' claims. Because the Court has already addressed this argument in the preliminary injunction context, it does not address it again.

members, Plaintiffs rely on various publicly available materials from government or non-profit sources (Dkt. 4-1 at p. 10). These materials estimate Idaho's undocumented alien population to be between 29,000 to 40,000 aliens.[12] Plaintiffs cite this range as an estimate of the number of members in the Entry Class (*id.*).

For the Reentry Class, Plaintiffs provide two methods of estimating the number of class members. The first method relies on the national number of federal reentry crimes charged in the United States in 2019, apportions those crimes to Idaho based on its undocumented alien population, and estimates that 92 reentry class members reside in Idaho (Dkt. 4-1, p. 13). The second method is similar but relies on "reinstated removal" charges—i.e., the number of aliens who have returned after being removed from the United States (*id.* at pp. 13-14). These charges number over 110,0000 annually between 2013 and 2019. Based on this number and on Idaho's undocumented alien population, Plaintiffs estimate 335 members in the Reentry Class (*id.*)

Defendants raise primarily two challenges to Plaintiffs' numerosity showing. First, they argue the materials on which Plaintiffs rely to estimate the number of undocumented aliens in Idaho is not "competent" (Dkt. 41 at p. 9). The Court disagrees. At this stage of the litigation, the Court's consideration is not limited to admissible evidence. *Sali*, 909 F.3d at 1004-06. For now, the Court finds the materials on which Plaintiffs rely are sufficiently probative for purposes of determining numerosity.

Second, although Defendants do not challenge Plaintiffs' number estimates per se, they argue the classes should be limited to "only those [aliens] who are investigated or detained for investigation of some independent crime under title 18 of the Idaho Code or the Uniform Controlled Substances Act" (Dkt. 41 at p. 10). The Court rejects this argument for two reasons.

---

[12]      These numbers do not include the authorized aliens in Idaho.

First, at this stage, Plaintiffs have not had an opportunity to discover the number of aliens whom Idaho law enforcement has investigated and detained. Second, whatever that number is, whether the number would be manageable in a traditional lawsuit is both speculative and doubtful. Based on Plaintiffs' present showing, the Court finds that the joinder of all class members would be impracticable and that Plaintiffs have satisfied the numerosity element at this stage for both the Entry and the Reentry Classes.

### 3. Commonality

Commonality requires the plaintiffs "to show that there are questions of law or fact common to the class" (Dkt. 41 at p. 5) (citation omitted). *Wal-Mart*, 564 U.S. at 349. The Supreme Court has ruled that commonality requires the plaintiffs to "demonstrate that the class members have suffered the same injury," not merely the violation of "the same provision of law." *Id.* at 349-50. "What matters to class certification is not the raising of common questions . . . but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (quotations, ellipses omitted). The plaintiffs' claims must "depend upon a common contention such that determination of their truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Parsons*, 754 F.3d at 675 (quotation omitted). The plaintiffs "need not show, however, that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement." *Id.* (quotation omitted).

Both Plaintiffs' proposed Entry and Reentry Classes rely on their claim that federal law preempts the challenged offenses (Dkt. 4-1 at p. 15). As explained above, the basis of Plaintiffs' federal preemption claim is that if the state regulation "has the same aim as federal law" and

"impose[s] its own penalties for the federal offenses," then it is federally preempted. *Arizona*, 567 U.S. at 402. Plaintiffs' proposed classes of "any person not a citizen or national of the United States"—in other words an alien as defined by 8 U.S.C. § 1101(a)(3)—include the category of persons who are potentially subject to being investigated, arrested, and prosecuted for Illegal Entry or Illegal Reentry (Dkt. 4-1). Thus, a determination that these offenses are federally preempted "resolve[s] an issue that is central to the validity of [Plaintiffs' preemption claim] in one stroke." *See Parsons*, 754 F.3d at 675.

Defendants challenge Plaintiffs' commonality showing by arguing that Plaintiffs' proposed classes are overly broad because they include "*[a]ll noncitizens* who may now or in the future enter or attempt to enter the state of Idaho" (Dkt. 41 at p. 6) (emphasis added). They argue that because Plaintiffs include all "noncitizens" as members, "the class would include many members who are not at 'significant risk of an imminent' harm" (*id.*). In support of this argument, however, Defendants cite to Plaintiffs' initial complaint (*id.*). Since filing that complaint, Plaintiffs have narrowed the class of individuals seeking relief to "any person not a citizen or national of the United States," or in other words anyone who is an alien under 8 U.S.C. § 1101 (Dkt. 4-1 at p. 2, Dkt. 41 at p. 13). Although Plaintiffs originally sought relief on behalf of all noncitizens, they have narrowed that request to aliens—the category of individuals subject to the allegedly preempted offenses. Accordingly, Defendants' argument that Plaintiffs' proposed classes are overly broad is moot.

Defendants also argue that "commonality requires [Plaintiffs] to demonstrate that the class members *have suffered* the same injury" but that Plaintiffs only assert the class members "are 'potentially' subject to the challenged [offenses]" (Dkt. 41 at p. 5). Defendants' argument, in essence, is that plaintiffs seeking pre-enforcement relief could never establish commonality under

Rule 23(a). As Defendants acknowledge, however, Plaintiffs can satisfy Rule 23(a)'s commonality requirement by showing "a common risk of future violation that flows from the same state-wide policy or practice." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 976 (9th Cir. 2019) (Dkt. 41 at p. 6) (citing *Tinsley*). Such is the case here. Accordingly, the Court finds Plaintiffs have satisfied the commonality requirement.

### 4. Typicality

Considerations underlying commonality and typicality often overlap considerably, such that they "tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Rule 23(a)(3) provides that one or more class members may sue as a representative of all the members if the representative's claims are typical of the members' claims. The named representative's claims are "typical" if they are "reasonably coextensive with those of absent class members." *Parsons*, 754 F.3d at 685. They need not be "substantially identical," however. *Id.*; *see also DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024). A representative "is not typical if there is a danger that absent class members will suffer if their representative is preoccupied" with issues unique to the representative. *Id.* (quotation omitted).

As with commonality, Defendants oppose Plaintiffs' allegations of typicality. They argue that the Individual Plaintiffs "do not have any injury typical of the classes" because "the challenged [offenses] do not pose a significant risk of imminent harm to the proposed class representatives" and that the Court "cannot assume that parties will engage in illegal conduct to find standing" (Dkt. 41 at p. 8). In other words, Defendants once again rehash their standing arguments, including that the independent crime requirement eliminates any risk of harm. Having already rejected these arguments, the Court need not consider them again.

As noted above, each of the Individual Plaintiffs attests he or she is an alien, who regularly enters or intends to enter Idaho and is subject to Idaho law. As a result, they are each subject to being detained or investigated by law enforcement and arrested and confined under the allegedly preempted offenses of Illegal Entry or Illegal Reentry. This claim is coextensive with absent class members who are, likewise, aliens in Idaho who may be subject to the same enforcement. Notably, the Individual Plaintiffs are not seeking individualized damages or presenting any claim unique to themselves. Accordingly, the Individual Plaintiffs have established typicality.[13]

### 5. Adequacy

Finally, Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class." This requirement serves both "to uncover conflicts of interest between the named parties and the class they seek to represent" and "the competency and conflicts of class counsel." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 n.20 (1997). The adequacy inquiry addresses two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quotations and internal citation omitted). "Where there are multiple proposed class representatives, a court need only find that one is an adequate class representative." *J.N. v. Oregon Dep't of Educ.*, 338 F.R.D. 256, 273 (D. Or. 2021) (citing *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009)).

---

[13]    Because the Court only needs to determine one class representative is adequate, it does not address Defendants challenge that IORC is not an adequate class representative (Dkt. 41 at pp. 8-9). *See Chambers v. Whirlpool Corp.*, 980 F.3d 645, 670-71 (9th Cir. 2000) (noting Rule 23(a) requirement satisfied as long as one of class representatives is an adequate class representative).

In appointing counsel, the court must consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B); *see also id.* 23(g)(2) (court may appoint the applicant as class counsel "only if the applicant is adequate under Rule 23(g)(1) and (4)"); *id.* 23(g)(4) ("Class counsel must fairly and adequately represent the interests of the class.").

Here, Defendants do not challenge the adequacy of Plaintiffs' counsel. Regardless, the Court has reviewed the declarations of proposed class counsel and finds that they have sufficient experience in complex litigation in federal courts, in the immigration area, and concerning constitutional violations; their work to date appears significant; and the ACLU has the resources to prosecute this action vigorously. Based on this record, the Court is satisfied Plaintiffs' counsel meets Rule 23(g)'s requirements, and it will not disturb Plaintiffs' choice of counsel. *See Wal-Mart*, 564 U.S. at 349 n.5 (noting that commonality and typicality, which the Court has found, inform the adequacy of class counsel); *Hu v. Plehn-Dujowich*, No. 18-CV-01791-EDL, 2019 WL 13090332, at *8 (N.D. Cal. Feb. 25, 2019) (quoting *Mateo v. M/S KISO*, 805 F. Supp. 761, 771 (N.D. Cal. 1991)) ("Absent a basis for questioning the competence of counsel, the named plaintiffs' choice of counsel will not be disturbed . . . .").

Defendants' only argument against the adequacy of the class representatives is, again, that Plaintiffs have not suffered any injury. Having already rejected this argument and considered Plaintiffs' declarations, the Court finds that the following Individual Plaintiffs adequately

represent the Entry class: L.M.C; W.G.C.; M.S.; A.M.R.; J.R.B.M. Each of these Plaintiffs fears separation from their family; each regularly travels in Idaho, including crossing over its borders; and there is no evidence they have any conflicts or will not prosecute the action vigorously.

For the same reasons, the Court finds the following Individual Plaintiffs adequately represent the Reentry Class: J.R.B.M., M.S., A.M.R. The Court notes that M.S and A.M.R. are unsure of their prior removal status, although they fear that status subjects them to Illegal Reentry. Regardless, J.R.B.M. was previously deported and now resides in Twin Falls, Idaho. Accordingly, even if M.S. and A.M.R.'s equivocation regarding their status makes them inappropriate class representatives, J.R.B.M. is an appropriate class representative, and the Court need only find one proper class representative.

Based on the foregoing, the Court provisionally certifies two classes, the Entry Class and the Reentry Class, for purposes of enjoining Defendants' enforcement of the challenged offenses of Illegal Entry and Illegal Reentry.

## D.    Scope of Injunction

In addition to their request for provisional class certification, Plaintiffs request a statewide injunction, explaining relief is "necessary to provide complete relief to the plaintiffs" (Dkt. 3-1 at p. 20) (citing *E. Bay Sanctuary Covenant*, 993 F.3d at 680). Generally, the scope of preliminary injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011). "[W]here relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

In opposition to Plaintiffs' request for statewide injunctive relief, Defendants argue that Plaintiffs' request is overbroad and that "preliminary injunctions must be limited to the parties of a given case" (Dkt. 36 at p. 28). In support, Defendants rely on *Poe*, 144 S. Ct. at 921 (signaling universal injunctions should rarely, if ever, be issued); *see also id.* at 923 (Gorsuch J., concurring); *id.* at 931 (Kavanaugh J., concurring). In *Poe*, several Supreme Court Justices questioned the value of universal injunctions and cast doubt on the propriety of issuing injunctions that apply to nonparties. *Id.* at 921-28. Nevertheless, two concurring opinions reference a class certification as a legitimate means to obtain injunctive relief for non-parties. *Id.* at 927, 932. Based on these references, this District has previously concluded class certification for purposes of a statewide injunction is appropriate. *See Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1349 (D. Idaho 2024) (discussing *Poe*, certifying proposed class, and enjoining enforcement of state law).

Here, Plaintiffs are not seeking a universal injunction; they are not seeking to enjoin the ICE Act's enforcement in its entirety. Rather, they seek only to enjoin the challenged offenses. For this purpose, the Court finds provisional class certification is appropriate for two classes—aliens in Idaho subject to Illegal Entry and to Illegal Reentry. Having found provisional class certification appropriate, the Court takes that certification into consideration for purposes of determining the injunction's effective scope.

The challenged offenses are applicable statewide and apply to all aliens within Idaho. Absent a statewide injunction, the class members would not obtain the requested relief. Furthermore, even the named Plaintiffs would not obtain the requested relief. Because the Individual Plaintiffs are currently proceeding under pseudonyms and the identity of the IORC's membership is not readily available, an injunction as to only the named Plaintiffs is impracticable. Law enforcement selectively enforcing the challenged offenses would not have the ability to

determine who is a named Plaintiff or a member of IORC. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996); *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1362 (N.D. Ga. 2023). In contrast, Defendants have not suggested any meaningful alternative scope for injunctive relief or adequately addressed the potential burden a statewide injunction poses for them. Based on the foregoing, the Court finds that the issuance of a preliminary injunction on a statewide basis is necessary and appropriate.

## ORDER

Accordingly, the Court hereby ORDERS:

1.     Plaintiffs' Emergency Motion for Temporary Restraining Order, Provisional Class Certification, and Preliminary Injunction is **GRANTED** (Dkt. 3).

    **a.**     The Court certifies the following provisional classes:

        **i.**     The Entry Class includes all aliens, as defined by 8 U.S.C. 1101, who may be subject to I.C. § 18-9003; and

        **ii.**     The Reentry Class includes all aliens, as defined by 8 U.S.C. 1101, who may be subject to I.C. § 18-9004.

    **b.**     The Court enjoins all Defendants, including their officers, agents, employees, attorneys, and any person acting in concert or participation with them, from enforcing Idaho Code §§ 18-9003, 18-9004.

    **c.**     The Court appoints counsel for Plaintiffs as counsel for the provisional classes.

2.     The bond requirement under Rule 65(c) of the Federal Rules of Civil Procedure is **WAIVED**.

DATED: April 29, 2025

Amanda K. Brailsford
U.S. District Court Judge